**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Mohammad Waheedullah KAHN; Muhammad Hanif; Abdul Karim; Abdul Rasheed, Defendants–Appellants.**

Nos. 93–10055, 93–10080, 93–10081 and 93–10645.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 8, 1994.

Decided Sept. 9, 1994.

As Amended on Denial of Rehearing Nov. 17, 1994.

Glen D. Choy, Honolulu, HI, for defendant-appellant Kahn.

Richard S. Kawana, Honolulu, HI, for defendants-appellants Hanif and Karim.

James Bustamante, San Francisco, CA, for defendant-appellant Rasheed.

Sharon Burnham, Asst. U.S. Atty., Honolulu, HI, for plaintiff-appellee.

Before: HUG, FARRIS, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must determine whether the United States has jurisdiction over foreign nationals smuggling hashish on a foreign ship seized by the Coast Guard in international waters.

I

In May and June 1991, undercover agents of the United States Customs Service and the Federal Bureau of Investigation arranged to help a ship, the LUCKY STAR, smuggle its 70 ton load of hashish. The LUCKY STAR was registered in St. Vincent, a sovereign island nation in the British West Indies, and carried a crew from Pakistan. The agents met with the Americans in charge of the drug deal in Hawaii, San Francisco, and New York to plan the operation. They agreed to ship the drugs into Eastern Canada, for distribution in New York, Montreal, and Toronto. The back-up plan provided for shipment to California or Alaska.

On July 1, 1991, a Coast Guard detachment aboard two Navy ships intercepted the LUCKY STAR in international waters. Upon request, the LUCKY STAR's master gave the Coast Guard permission to board. The Coast Guard and a contingent of Navy personnel under Coast Guard command boarded and searched the ship, eventually finding the hashish. The Coast Guard then sought consent from St. Vincent through diplomatic channels to apply American law to the ship and crew. The Coast Guard and Navy boarding party remained on board to secure the ship while waiting for St. Vincent's response. With the master's permission, the Coast Guard directed the ship to sail toward Hawaii.

St. Vincent gave its consent on July 11, 1991. At that point, the Coast Guard arrested the crew, seized the ship, and escorted it to Hawaii.

Appellants are crew members who were charged with possession of hashish while aboard a ship subject to United States jurisdiction, pursuant to 46 App.U.S.C. § 1903. On June 10, 1992, the crew members entered

conditional guilty pleas preserving the right to appeal the jurisdictional issue.

## II

The crew members argue that the United States did not have jurisdiction over the LUCKY STAR under 46 App.U.S.C. § 1903 when the Coast Guard interdicted, boarded, and searched the ship, arrested the crew, and redirected the ship's route to Hawaii.

■ Section 1903(a) provides that "[i]t is unlawful for any person on board ... a vessel subject to the jurisdiction of the United States ... to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance." 46 App.U.S.C. § 1903(a). A vessel subject to the United States jurisdiction includes "a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of the United States law by the United States." 46 App.U.S.C. § 1903(c)(1)(C). The United States does not have jurisdiction under this law unless the application of section 1903 meets the test articulated in *United States v. Davis*, 905 F.2d 245 (9th Cir.1990), *cert. denied*, 498 U.S. 1047, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991). First, Congress must "make clear its intent to give extraterritorial effect to its statutes." *Id.* at 248.[1] Second, application of the statute must not violate due process, meaning that "there must be a sufficient nexus between the [crew members] and the United States so that such application would not be arbitrary or fundamentally unfair." *Id.* at 248–49.[2]

## A

■ To meet the nexus requirement, the government must show that the plan for shipping the drugs was likely to have effects in the United States. For instance, "[w]here an attempted transaction is aimed at causing criminal acts within the United States, there is a sufficient basis for the United States to exercise its jurisdiction." *Id.* at 249 (citation omitted). Further, "[a] sufficient nexus exists where the ship with drugs is bound ultimately for the United States." *United States v. Aikins*, 946 F.2d 608, 613–14 (9th Cir.1990); *United States v. Gonzalez*, 810 F.2d 1538, 1542 (11th Cir.1987) (sufficient nexus under section 1903's predecessor, 21 U.S.C. § 955(a), requires "that the [ship's] intended destination was the United States or that the crew members' purpose was to send [the drugs] into this country") (citation omitted).

Here, the district court found that Americans controlled the movements and actions of the LUCKY STAR, that the LUCKY STAR's backup landing sites were Alaska and California, and that the primary plan called for landing in Canada and transporting the drugs overland to Montreal, Toronto, and New York. The court also found that the coordination and control of the conspiracy occurred in the United States.

These facts—most importantly, the alternative plan to land in the United States and the primary plan to transport drugs overland to New York—support a holding that there was a sufficient nexus between the LUCKY STAR and the United States. Whether the LUCKY STAR itself was to dock in the United States or whether the drugs were to be shipped overland from Canada, the purpose of the smuggling operation was to bring drugs into the United States. *See Aikins*, 946 F.2d at 614 ("[A]lthough the [ship] was not headed in the direction of the United States, the entire operation of off-loading was set up by an agreement that was designed to bring the off-loaded [drugs] into the United States. A sufficient nexus existed."); *United States v. Peterson*, 812 F.2d 486, 493 (9th Cir.1987) ("substantial evidence that the

---

1. This first prong is not at issue here. Congress has "explicitly stated that it intended the Maritime Drug Law Enforcement Act to apply extraterritorially." *Id.*

2. The Third Circuit disagrees with the Ninth Circuit's interpretation of § 1903. In *United States v. Martinez–Hidalgo*, 993 F.2d 1052, 1056 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct.

699, 126 L.Ed.2d 666 (1994), the Third Circuit held that the United States "need not establish a domestic nexus to prosecute offenses under the Maritime Drug Law Enforcement Act." The court explained that it saw "nothing fundamentally unfair in applying section 1903 exactly as Congress intended—extraterritorially without regard for a nexus." *Id.*

drugs were bound ultimately for the United States" supports conclusion of sufficient nexus).

The crew members contend that the evidence relied upon by the district court is not determinative because contrary evidence exists. Specifically, they maintain that the intended destination of the drugs was Canada and that there was no plan to ship to the alternative sites in the United States. This argument is of no avail. The undercover agents' testimony supports the district court's determination that the LUCKY STAR had alternative landing sites in the United States and that the drugs' final destination was New York. Therefore, the district court's findings of fact are not clearly erroneous and support the holding that a sufficient nexus exists.

### B

■ The crew members argue that because St. Vincent's consent to the United States boarding, searching, and seizing the LUCKY STAR occurred ten days after the Coast Guard first boarded the ship, assertion of United States authority over the LUCKY STAR for those days violated due process.

The crew members offer no support for this argument. They cite no cases in which a court has held that the United States lacked jurisdiction or violated due process because the Coast Guard boarded a ship before receiving the permission of the flag nation. To the contrary, courts have upheld jurisdiction where the Coast Guard boarded first and obtained consent later. *See United States v. Mena*, 863 F.2d 1522, 1533 (11th Cir.) (upholding United States jurisdiction where Coast Guard boarded and searched foreign ship and arrested crew before receiving flag nation's consent), *cert. denied*, 493 U.S. 834, 110 S.Ct. 109, 110, 107 L.Ed.2d 72 (1989); *United States v. Robinson*, 843 F.2d 1, 4 (1st Cir.) (upholding United States jurisdiction under § 955(a) although boarding occurred before consent obtained), *cert. denied*, 488

U.S. 834, 109 S.Ct. 93, 102 L.Ed.2d 69 (1988); *United States v. Gonzalez*, 776 F.2d 931, 934 (11th Cir.1985) (same).[3]

Although the Ninth Circuit has not directly addressed the issue of the timing of consent, it is logical that the Coast Guard may seize a ship before it receives permission from the flag nation. Obtaining consent can be a lengthy process. If the Coast Guard could not hold a suspected ship while waiting, the ship would have an opportunity to escape or to destroy evidence. In this case, the Coast Guard secured the ship only to eliminate this chance of escape; it did not arrest the crew until St. Vincent consented to United States authority. For these reasons, we hold that the Coast Guard's boarding and searching of the LUCKY STAR, with the ship master's consent, before obtaining consent of the flag nation did not deprive the United States of jurisdiction.

### C

■ Finally, the crew members argue that the United States did not have jurisdiction over the LUCKY STAR under section 1903 because the application of that statute in this case violated the Ex Post Facto Clause of the Constitution. They contend that their possession of hashish in international waters became illegal only when St. Vincent consented to the authority of United States law.

This court already has rejected this argument. *Aikins*, 946 F.2d at 613 ("The statute is not applied to the defendants ex post facto; although Panama gave its consent after they had set to sea, they took the risk of such consent being given."); *see also Mena*, 863 F.2d at 1528 ("The conduct prohibited by the statute ... was clearly defined before the defendants embarked on their voyage. Defendants accepted the risk that Honduras would consent."). Therefore, the application of United States law to the crew members was not an ex post facto violation.

**3.** In their reply brief, the crew members argue that PL 100–690, Title IV, § 4802(a)(2) requires consent before boarding. This section, however, states that "before boarding and inspecting such a vessel, the Coast Guard must obtain consent from *either the master of the vessel* or the country of registry." (Emphasis added.) There is no question that the master of the LUCKY STAR gave permission for the Coast Guard to board.

## III

The crew members argue that the district court should have granted their motion for discovery of the negotiations between the United States and St. Vincent on the issue of consent.[4]

We hold that the district court did not abuse its discretion in refusing the motion for discovery; the information sought by the crew members was immaterial to their defense. There is no question that St. Vincent did consent and, as discussed above, the timing of its consent is irrelevant. Further, the district court examined in camera some of the documents at issue and determined that they were not relevant to whether the United States had proper jurisdiction under section 1903. Because the crew members have not shown that the requested discovery was "material to the preparation of the defendant[s'] defense," Fed.R.Crim.P. 16(a)(1)(C), the district court did not abuse its discretion in denying the motion.

## IV

The crew members argue that the government violated the Posse Comitatus Act and 10 U.S.C. § 375 by involving the Navy in the seizure of the LUCKY STAR. The Posse Comitatus Act, 18 U.S.C. § 1385, forbids only the use of the Army or Air Force in law enforcement activities. However, a separate statute, 10 U.S.C. § 375, requires the Secretary of Defense to issue regulations prohibiting direct participation by military personnel in a civilian search, seizure, arrest, or other similar activity unless expressly authorized by law. *See United States v. Yunis*, 924 F.2d 1086, 1094 (D.C.Cir.1991). "Regulations issued under 10 U.S.C. § 375 require Navy compliance with the restrictions of the Posse Comitatus Act...." *Id.; see also* 32 C.F.R. § 213.10.[5] Thus, the Posse Comitatus Act applies to the Navy through section 375 and 32 C.F.R. § 213.10.[6]

However, these regulations also "interpret that Act as allowing 'indirect assistance' to civilian authorities that does not 'subject civilians to the exercise of military power that is regulatory, proscriptive, or compulsory in nature.'" *Yunis*, 924 F.2d at 1094 (quoting 32 C.F.R. § 213.10(a)(7)). The court in *Yunis* set out the three tests to determine when military involvement constitutes more than indirect assistance. The involvement must not "constitute the exercise of regulatory, proscriptive, or compulsory military power," must not "amount to direct active involvement in the execution of the laws," and must not "pervade the activities of civilian authorities." *Id.* (citations omitted). If any one of these tests is met, the assistance is not indirect.

The district court found that the Navy participated in the operation by providing ships, communication on the LUCKY STAR's position, aerial reconnaissance, and intercep-

4. It appears that three of the crew members did not preserve this issue for appeal when they pleaded guilty. Their plea agreement states that they "reserv[e] the right to appeal Judge Alan C. Kay's order of June 1, 1992 on the issue of jurisdiction." Judge Kay ruled on the discovery motion in an order dated May 21, 1992. However, since one appellant, Abdul Rasheed appears to have preserved the issue for appeal, we address the merits of the argument.

5. This part of the C.F.R. was removed on April 28, 1993. 58 Fed.Reg. 25,776–01 (1993).

6. The government questions whether the Posse Comitatus Act applies to the involvement of the military in civilian law enforcement against foreign nationals outside the United States. In *Chandler v. United States*, 171 F.2d 921, 936 (1st Cir.1948), *cert. denied*, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed.2d 1081 (1949), the court stated that the Act was "the type of criminal statute which is properly presumed to have no extraterritorial application in the absence of statutory language indicating a contrary intent." More recently, the D.C. Circuit has noted that "some courts have taken the view that the Posse Comitatus Act imposes no restriction on use of American armed forces abroad." *Yunis*, 924 F.2d at 1093. While there is no definitive statement on the scope of the Act, 10 U.S.C. §§ 371–80 provides for the limited involvement of the military in civilian law enforcement outside the United States. *See, e.g.,* § 374(b)(2)(F) (mentioning "law enforcement operation outside of the land area of the United States"); § 379(a) (mentioning "naval vessels at sea"); § 379(d) (mentioning "area outside the land area of the United States"). Since these sections impose limits on the use of American armed forces abroad, the appellee is wrong in suggesting that the restrictions on military involvement in civilian law enforcement operations do not extend to activities outside the United States.

tion of the LUCKY STAR. The district court further noted that at all times, the Navy personnel on board the LUCKY STAR had acted under the command of the Coast Guard, and that only the Coast Guard had searched the ship and arrested the crew. The district court concluded that the Navy provided only logistical support and backup security. The crew members have provided no reason to doubt these factual findings.

■ None of the Navy's activities was illegal. Section 374(b)(2) authorizes the Navy to participate in civilian law enforcement by detecting, monitoring, and communicating the movement of sea traffic, by providing aerial reconnaissance, and by intercepting vessels. Further, where the Navy provides backup support in a Coast Guard operation and does not participate in the search of the ship or the arrest and interrogation of the suspects, the military assistance is not direct, not an exercise of military power, and not pervasive of the activities of civilian authorities. *Yunis*, 924 F.2d at 1094 (where the "Navy personnel played only a 'passive' role in housing, transporting, and caring for [appellant] while he was in the custody of the FBI," there was no violation of the three tests); *United States v. Mendoza–Cecelia*, 963 F.2d 1467, 1478 (11th Cir.) ("[T]he Coast Guard did the actual boarding, arrest, interrogation, and ensuing investigation of all criminal matters. Consequently, the passive participation of the Navy in the arrest of the crew ... did not implicate the Posse Comitatus Act."), *cert. denied,* —— U.S. ——, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992). Since the Navy participation here was limited to backup support, it did not violate section 375 or the Posse Comitatus Act.[7]

### V

■ The crew members argue that the seizure of the LUCKY STAR violated international law, thus requiring dismissal for lack of jurisdiction. This argument has no merit.

The Ninth Circuit has held that "compliance with international law does not determine whether the United States may apply [section 1903] to [crew members'] conduct." *Davis,* 905 F.2d at 248. Also, section 1903(d) states that "a failure to comply with international law shall not divest a court of jurisdiction or otherwise constitute a defense to any proceedings under this chapter." 46 App. U.S.C. § 1903(d).

### VI

Because the United States had jurisdiction over the LUCKY STAR pursuant to 46 App. U.S.C. § 1903, the application of United States law to the crew members was proper. The Navy did not violate the Posse Comitatus Act or 10 U.S.C. § 375 in supporting the Coast Guard operation.

AFFIRMED.

---

7. The crew members' citation to *United States v. Roberts,* 779 F.2d 565, 568 (9th Cir.) (holding that Navy interception of drug smuggling ship violated 10 U.S.C. § 374, which allowed use of Navy equipment only for monitoring and communication), *cert. denied,* 479 U.S. 839, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986), does not support their argument that the Navy violated the law by participating in the seizure of the LUCKY STAR. *Roberts* refers to an old version of § 374, which specifically stated that the military could not "interdict or ... interrupt the passage of vessels." 10 U.S.C. § 374(c)(1)(A) (1983). This language has since been deleted.